IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

COMITÉ DIALOGO AMBIENTAL, INC., *et al.*,

    **Plaintiffs**,

        v.

FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*,

    **Defendants**.

CIVIL NO. 24-1145 (JAG)

MEMORANDUM AND ORDER

GARCIA-GREGORY, D.J.

    Pending before the Court are Plaintiffs' Motion for Summary Judgment, Docket No. 46; and Defendants' Cross-Motion for Summary Judgment, Docket No. 62. For the following reasons, Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and Defendants' Cross-Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

    I.    Standing

    Article III of the U.S. Constitution limits the jurisdiction of federal courts to actual cases and controversies. *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 46 (1st Cir. 2020). "A case or controversy exists only when the party soliciting federal court jurisdiction (normally, the plaintiff) demonstrates such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012) (cleaned up). Therefore, "plaintiffs must establish that they have standing to sue." *Clapper v. Amnesty Int'l USA*,

**CIVIL NO. 24-1145 (JAG)** 2

568 U.S. 398, 408 (2013) (cleaned up). "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019); *see Rumsfeld v. Forum for Acad. & Inst'l Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (citation omitted).

As applicable here,

> In order to ground a claim of associational standing (that is, standing to bring suit on behalf of its membership), [Plaintiffs] must show three things: (i) that individual members would have standing to sue in their own right; (ii) that the interests at stake are related to the organization's core purposes; and (iii) that both the asserted claim and the requested relief can be adjudicated without the participation of individual members as named plaintiffs.

*Maine People's All. And Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 283 (1st Cir. 2006). Specifically, "plaintiffs must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Katz*, 672 F.3d at 79 (cleaned up); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992) ("To survive the [] summary judgment motion, respondents had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by [the challenged] activities . . . but also that one or more of [Plaintiffs'] members would thereby be directly affected apart from their special interest in th[e] subject.") (cleaned up).

It is uncontested that the interests at stake in this litigation are related to Plaintiffs' core purposes, *see* Docket No. 1 at 8-17, and that the claim can be adjudicated without the participation of individual plaintiffs as named plaintiffs. Thus, the Court need only determine whether an individual member of Plaintiffs' organizations would have standing to sue in their own right.

### A. Constitutional Requirements

The standing inquiry involves constitutional concerns and prudential concerns. First, "[t]he irreducible constitutional minimum of standing entails three elements." *Dantzler*, 958 F.3d at 47 (cleaned up). "[A] plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."[1] *Dep't of Com.*, 588 U.S. at 766 (cleaned up). Here, Defendants do not contest the injury-in-fact requirement, Docket No. 62-1 at 15, but in any case the Court finds that they have met this requirement so the Court will only address traceability and redressability.

### 1. Traceability

As is the case here, "when a plaintiff alleges a 'procedural injury'—including the failure to comply with [the National Environmental Policy Act ("NEPA")]—the causation and redressability requirements are relaxed . . . [but] only in the sense that a plaintiff need not establish the likelihood that the agency would render a different decision after going through the proper procedural steps." *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1216 (9th Cir. 2023) (cleaned up). Plaintiffs "need not show that the agency action would have been different but for the procedural violation." *Mass. Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 752 F. Supp. 3d 13, 18 (D.D.C. 2024) (cleaned up).

"The traceability or causation element requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm. That connection cannot

---

[1] "These standing requisites must be proved with the manner and degree of evidence required at the successive stages of the litigation." *Mallinckrodt, Inc.*, 471 F.3d at 283. At the summary judgment phase, Plaintiffs bear the burden of showing the existence of standing by a preponderance of the evidence.

**CIVIL NO. 24-1145 (JAG)**                                                                                          4

be overly attenuated." *Dantzler*, 958 F.3d at 47 (cleaned up). It is enough to show that the asserted injury is "fairly traceable" to the defendant's action; proximate causation is not needed. *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 923 F.3d 209, 222 (1st Cir. 2019).

Defendants claim that Plaintiffs cannot meet the traceability requirement because the injuries asserted are the result of actions by third parties. Docket No. 62-1 at 14-17. The Court disagrees. While it is true that the causation "requirement forces plaintiffs to show that their injury fairly can be traced to the challenged action of the defendant, and not . . . some third party not before the court," Plaintiffs can still show causation by "showing that third parties will likely react in predictable ways to the defendant's conduct." *Mass. Coal. for Immigr. Reform*, 752 F. Supp. 3d at 29 (cleaned up). "The key inquiry is whether the defendant's actions were a substantial factor motivating the decisions of the third parties that were the direct source of the plaintiff's injuries. Article III demands far less than statistical certainty; it asks only for *de facto* causality." *Id.* at 29-30.

Here, Defendants' decision as to how to channel billions of dollars in federal disaster aid, without which Puerto Rico would not have had the necessary resources to reestablish power in the island, would be a substantial factor motivating the decisions of the third parties that were the direct source of the plaintiff's injuries, i.e. the entities that operate the different components of the electrical power system in Puerto Rico. *Sierra Club v. Glickman*, 156 F.3d 606, 614 (5th Cir. 1998) ("[T]he relevant inquiry in this case is whether [the defendant] has the ability through various programs to affect the [ ] decisions of those third part[ies] to such an extent that the plaintiff's injury could be relieved.") (cleaned up). FEMA's funding decisions "exert[] a determinative [] effect on the third-party conduct that directly causes the injury." *WildEarth Guardians*, 70 F.4th at 1217 (cleaned up); *see also id.* ("The injury was caused by development carried

**CIVIL NO. 24-1145 (JAG)**                                                                                          5

out by third parties, but the [defendant] regulated whether that development could occur.") (citation omitted). Plaintiffs' "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Com.*, 588 U.S. at 768 (citations omitted). Thus, Plaintiffs meet the traceability requirement.

   **2. Redressability**

Turning to the redressability of Plaintiffs' asserted injuries, this "element of standing requires that the plaintiff [show] that a favorable resolution of [its] claim would likely redress the professed injury. This means that it cannot be merely speculative that, if a court grants the requested relief, the injury will be redressed." *Dantzler*, 958 F.3d at 47 (cleaned up). The First Circuit has found that "[i]n cases of alleged procedural harm . . . plaintiffs receive special treatment. The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 27 (1st Cir. 2007) (cleaned up). As such, Plaintiffs "need not demonstrate that [their] entire injury will be redressed by a favorable judgment, [but they] must show that the court can fashion a remedy that will at least lessen its injury." *Dantzler*, 958 F.3d at 47 (citations omitted); *see Katz*, 672 F.3d at 72 ("To satisfy [the redressability] requirement, the plaintiff need not definitively demonstrate that a victory would completely remedy the harm.") (cleaned up). In cases like the present action, where a plaintiff asserts a procedural injury, redressability is an "undemanding burden." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1120 (9th Cir. 2004). In these cases, "[a]ll that is required . . . is some

**CIVIL NO. 24-1145 (JAG)**                                                                                          6

possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Impson*, 503 F.3d at 28 (cleaned up).

Because Plaintiffs' claims center around the "inadequacy of a government agency's environmental studies under NEPA[, they] need not show that further analysis by the [agency] would result in a different conclusion. It suffices that, as NEPA contemplates, the [agency's] decision could be influenced by the environmental considerations that NEPA requires an agency to study." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001) (citation omitted). Plaintiffs have shown that:

> In the aftermath of Hurricanes Irma and Maria, multiple studies analyzed the best ways to rebuild Puerto Rico's energy system. The universal conclusion was that widespread adoption of distributed solar and storage could create an energy future for Puerto Rico that was not only more resilient against future storms, but was also cleaner, more affordable, more equitable, and offered economic opportunities for Puerto Rican communities.

Docket No. 46-2 at 11-12. The Court finds this is sufficient to show that Defendants' decision could be influenced by environmental considerations that must be studied under NEPA.

Accordingly, the Court finds that Plaintiffs have standing to pursue this suit.

## II. Merits

Having found that Plaintiffs have standing to pursue this case, the Court now turns to the merits of the Parties' motions. Plaintiffs contend that Defendants violated NEPA by (1) failing to consider distributed renewable energy alternatives, (2) failing to engage with public comments proposing renewable energy alternatives, (3) failing to adequately examine the environmental harms associated with rebuilding the fossil fuel grid, (4) relying on undefined mitigation measures or promises of future tiering as substitutes for taking a hard look at environmental impacts, (5) refusing to prepare an EIS for the proposed projects, and (6) failing to undertake additional NEPA

review in light of significant new information undermining the agency's decision. Docket No. 46-2.

NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir. 1996) (citations omitted). It "is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *W. Watersheds Project v. Grimm*, 921 F.3d 1141, 1143-44 (9th Cir. 2019) (citation omitted). "Congress, in enacting NEPA, meant to insure a fully informed and well-considered decision." *Dubois*, 102 F.3d at 1284 (cleaned up).

"The primary mechanism for implementing NEPA is the Environmental Impact Statement (EIS) . . . [which] is an action-forcing procedure, designed [t]o ensure that this commitment is infused into the ongoing programs and actions of the Federal Government." *Id.* at 1285 (cleaned up). As such, NEPA requires the preparation of an EIS "[w]hen a major federal agency action will have significant environmental effects." *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 9 (1st Cir. 2024) (citations omitted). "The EIS helps satisfy NEPA's 'twin aims': to ensure that the agency takes a 'hard look' at the environmental consequences of its proposed action, and to make information on the environmental consequences available to the public, which may then offer its insight to assist the agency's decision-making through the comment process." *Dubois*, 102 F.3d at 1285-86 (cleaned up). The preparation of an "EIS thus helps [e]nsure the integrity of the process of decision, providing a basis for comparing the environmental problems raised by the proposed project with the difficulties involved in the alternatives." *Id.* (cleaned up).

**CIVIL NO. 24-1145 (JAG)**                                                                                                                           8

"Judicial review of agency decisions under NEPA . . . is provided by the [Administrative Procedure Act], which maintains that an agency action may be overturned only when it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006) (cleaned up). "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions, *and* that its decision is not arbitrary or capricious." *Dubois*, 102 F.3d at 1284 (cleaned up).

In reviewing FEMA's decision not to prepare an EIS, the Court must consider "whether the agency has taken a hard look at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Barnes v. Fed. Aviation Admin.*, 865 F.3d 1266, 1269 (9th Cir. 2017) (cleaned up). "[O]ne challenging a decision *not* to prepare an EIS must show a substantial possibility that agency action could significantly affect the quality of the human environment. If the record reveals such a 'substantial possibility' with sufficient clarity, the agency's decision (not to produce an EIS) violates NEPA." *Sierra Club v. Marsh*, 769 F.2d 868, 870-71 (1st Cir. 1985) (cleaned up).

Here, Plaintiffs challenge FEMA's decision not to prepare an EIS in relation to two Programmatic Environmental Assessments ("PEA"): (1) Utility Repair, Replacement, and Realignment ("Utilities PEA"), and (2) Public Facilities Infrastructure Recovery and Resiliency ("Public Facilities PEA"). The Court shall address each challenge in turn.

CIVIL NO. 24-1145 (JAG)                                                                                              9

A. Utilities PEA

In the present case, it is uncontested that the projects encompassed by the Utilities PEA constitute a "major Federal action" under NEPA. Moreover, the record shows that "substantial questions are raised as to whether [the projects at issue] . . . *may* cause significant degradation of some human environmental factor." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864-65 (9th Cir. 2005) (cleaned up). We do not see how FEMA could argue that there is no substantial possibility that the projects contemplated by the Utilities PEA could significantly affect the quality of the human environment. Most Puerto Ricans depend on an electrical power infrastructure that relies primarily on fossil fuels. Docket Nos. 46-1, ¶ 2; 46-6 at 13. The record amply shows that the existing infrastructure has proven inadequate, unreliable, and extremely vulnerable to weather events, events whose effects will be more severe in the future due to climate change.[2] Thus, any funding decisions as to how to reestablish electricity in Puerto Rico would significantly affect that quality of the human environment, especially considering that, as FEMA itself recognizes, "[f]ailure of these [utility] systems can cause injury, loss of life, and

---

[2] *See* Docket Nos. 46-6 at 14 ("PREPA's transmission and distribution (T&D) systems, a majority of which are above ground[,] were particularly vulnerable to the high winds, torrential rains, and erosion-related landslides associated with the recent hurricanes . . . electric power generation facilities are tied to each other using high voltage overhead transmission lines that run over mountainous terrain. Due to the physical location of these electrical connections, they are subjected to hurricane force winds and are most likely to fail, as experienced during Hurricane Maria."), 15 ("Transmission lines in the center of the island were severely impacted, as high winds were tunneled through the changes in terrain and tore down large transmission lattice towers. Historical storm tracks . . . suggest similar impacts can be expected in the future."), 99 ("Puerto Rico's electrical grid was vulnerable before the hurricanes due to a fragile system, dependency on fossil fuels, lack of skilled workers, and outstanding debt."); 49-1 at 15 ("Experts predict that extreme weather will continue to jeopardize electric power systems. The need to transition to renewable power sources [] is immediate . . . Rather than repairing a grid that does not provide sustainable or reliable power, communities should evaluate and shift to new solutions.").

**CIVIL NO. 24-1145 (JAG)** 10

environmental issues." Docket No. 46-6 at 116;[3] *see also* Docket No. 46-6 at 188 ("The mission of [FEMA] is to reduce the loss of life and property and protect our institutions from all hazards by leading and supporting the nation in a comprehensive, risk-based emergency management program of mitigation, preparedness, response, and recovery."). This is sufficient to require the preparation of an EIS, especially since the Court agrees that the Utilities PEA and accompanying finding of no significant impact ("FONSI") failed to offer adequate explanations—merely offering conclusory statements not supported by studies, analysis, or data—as to why FEMA disregarded the comments submitted by Plaintiffs and made a finding of no significant impact. Docket No. 46-2 at 19-22; *see Ohio v. Env't Prot. Agency*, 603 U.S. 279, 297 (2024) (finding that the agency's response to the petitioners' comments was legally insufficient because it failed to meaningfully address the issue raised).

Additionally, "[w]hether a project has significant environmental impacts, thus triggering the need to produce an EIS, depends on its 'context' (region, locality) and 'intensity' ('severity of impact')." *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (citation

---

[3] The Utilities PEA also states:

> For example, failing transmission lines may start fires or present an electrocution risk, or waste systems may discharge pollutants into waterways. Should utility systems fail, local governments may be unable to provide critical services including fire suppression, emergency communication, power generation, potable water, and wastewater treatment. Additionally, the lack of utilities such as electricity and water can be life-threatening for at-risk populations like the elderly, young, and the sick. In an effort to restore these services and/or mitigate these impacts, federal agencies led by FEMA may provide funds for utility system restoration, replacement, upgrade, expansion, redesign, or relocation.

Docket No. 46-6 at 116.

**CIVIL NO. 24-1145 (JAG)** 11

omitted). The Court agrees that several intensity factors support the preparation of an EIS. The agency's decision is significant since it will affect the vast majority of Puerto Rico. Continued reliance on the existing energy infrastructure will affect public health and safety considering the frequent power outages caused by the aging infrastructure. The projects will also likely affect park lands, ecologically critical areas, and protected species considering that transmission lines run through some of these areas/habitats. Additionally, continuing to rely on the current infrastructure may pose uncertain or unknown risks to the human environment. It could also establish a precedent for future actions with significant effects: if FEMA funding continues to be channeled to fossil fuel-based infrastructure, it is unlikely that Puerto Rico will have the resources to pursue renewable energy alternatives in the near future.

The Court is not persuaded by FEMA's argument that it was not obligated to analyze other alternatives that were not submitted by project applicants. Adopting this argument would effectively allow an agency to bypass NEPA's requirements merely because an applicant did not provide alternatives. *See also Dubois*, 102 F.3d at 1291[4] ("NEPA requires the agency to try *on its own* to develop alternatives that will mitigate the adverse environmental consequences of a proposed project. In respect to alternatives, an agency must *on its own initiative study all alternatives that appear reasonable and appropriate* for study at the time, and must also look into other significant alternatives that are called to its attention by other agencies, or by the public during the comment period afforded for that purpose.") (cleaned up) (emphasis added). And it would allow FEMA to flout

---

[4] While this case addresses the adequacy of an EIS, the EA also requires consideration of alternatives and it would feel incongruous to require the agency to develop and study reasonable alternatives on its own initiative at the EIS stage and not at the EA stage, since the EA is the document that will allow agencies to decide whether an EIS is required under NEPA.

**CIVIL NO. 24-1145 (JAG)**                                                                                                          12

its obligations under NEPA to make decisions based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. The case law is clear that "[a]n EA must include brief discussions of the need for the proposal, *of alternatives*[,] and of the environmental impacts of the proposed action and alternatives." *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 46 (D.D.C. 2022) (cleaned up) (emphasis added); *see United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 38 (1st Cir. 2011); *McGuinness v. U.S. Forest Serv.*, 741 F. App'x 915, 927 (4th Cir. 2018); *Hapner v. Tidwell*, 621 F.3d 1239, 1244 (9th Cir. 2010); *Sierra Club v. Espy*, 38 F.3d 792, 802 (5th Cir. 1994).

The Court also rejects Defendants' argument that the renewable energy alternatives did not meet the purposes and need of the Utilities PEA, or that these alternatives were not feasible. First, the Utilities PEA states:

> The purpose of this action is to provide grant funding to restore damaged utilities and increase their resiliency for future weather events . . . The need for the action is to *re-establish a safe and reliable network of utilities* (through repair, *replacement*, or relocation) in order to reconnect the communities affected by the storm with safe and efficient delivery of energy, water, sewer service, and communications, and help reduce the potential for future damages by upgrading damaged utilities in accordance with current engineering codes and standards. The grant funding is necessary to address these concerns and reduce the damage and disruption caused by future disasters throughout the Commonwealth.

Docket No. 46-6 at 116 (emphasis added). FEMA's FONSI also stated that "[t]he types of utilities projects covered under this PEA involve repair, restoration, *replacement*, and hazard mitigation of the Commonwealth's utility and communications systems." Docket No. 46-6 at 189 (emphasis added). The Court cannot find that these statements limited FEMA's analysis to rebuilding the electrical power infrastructure as it was before Hurricanes Irma and Maria. Moreover, this narrow

reading would contravene the purpose of NEPA's aim to protecting and promoting environmental quality. The record clearly shows that renewable energy alternatives were reasonable and feasible. *See* Docket Nos. 46-1 at 2-5; 46-6 at 5-67, 97-106. Thus, FEMA violated NEPA by failing to consider renewable energy alternatives, especially since this issue was presented to FEMA during the public comments period. *See* Docket Nos. 46-1 at 6; 46-2 at 20; *see Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973) ("[W]here comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response."). Thus, FEMA should have considered renewable energy alternatives.

The Court is also unpersuaded by Defendants' claim that it must accord substantial weight to the preferences of the applicant. Puerto Rico's own Central Office for Recovery, Reconstruction and Resiliency ("COR3") prepared a report titled *Build Resilient Communities, Modernize Infrastructure, and Restore the Natural Environment* that reflected the desire to transform the energy system by "[d]evelop[ing] an energy system that is customer-centric, affordable, reliable, and scalable; *incorporates more renewables, microgrids, and distributed energy resources*: and can drive new businesses and employment opportunities and support residents' well-being." Docket No. 46-6 at 99 (emphasis added). Similarly, the December 2017 Build Back Better Report submitted by *inter alia* the Puerto Rico Electric Power Authority and Puerto Rico Energy Commission states:

> The Government of Puerto Rico views the recovery effort as an opportunity to *transform* the Island by implementing solutions that are cost-effective and forward-looking, harness innovative thinking and best practices, and revitalize economic growth. The Governor is sharing this economic and disaster recovery plan consistent with his vision: 'To build the new Puerto Rico to meet the current and

CIVIL NO. 24-1145 (JAG)                                                                 14

> future needs of the people through *sustainable* economic development and social transformation; transparent and innovative approaches to governance; *resilient, modern, and state-of-the-art infrastructure*; and a safe, educated, healthy, and *sustainable* society.'

Docket No. 46-6 at 74 (emphasis added).

As to Defendants' reliance on mitigation measures to make a finding of no significant impact, "[a]s a general rule, the regulations contemplate that agencies . . . should not rely on the possibility of mitigation to avoid the EIS requirement." *Marsh*, 769 F.2d at 877. Mitigation measures can only support a finding of no significant impact if "imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal." *Id.* (citation omitted). As the First Circuit has stated that

> If a proposal appears to have adverse effects which would be significant, and certain mitigation measures are then developed during the scoping or EA stages, the existence of such possible mitigation does not obviate the need for an EIS[, which] is essential to ensure that the final decision is based on all the relevant factors and that the full NEPA process will result in enforceable mitigation measures through the Record of Decision.

*Id.* (citation omitted). On several instances, the Utilities PEA does not include mitigation measures although FEMA concluded that the alternative would have potential impacts; and in other instances, the proposed mitigation measures are conclusory or insufficiently specific.[5] Thus,

---

[5] *See, e.g.*, Docket No. 46-6 at 128 (as to the potential impacts to geology, FEMA found that Alternatives 2 and 3 could cause soil disturbances and changes to topography, but concluded the impact would be negligible to minor without providing support for this statement or proposing mitigation measures), 138 (finding that "[c]ompensatory mitigation may offset adverse impacts to wetlands" without specifying the measures contemplated), 140 (finding that "[c]ompensatory mitigation could offset adverse impacts to wetlands" without specifying the measures contemplated), 143 (notes that the alternative "would have short-term negligible impact on floodplains and floodways due to the actions covered by this PEA, mitigation measures, and compliance with local and federal permit requirements" but fails to specify the measures contemplated), 146 (notes that "[c]oordination with PRDNER and PRPB will occur prior to any work and limit impacts to the extent possible" but fails to specify the measures contemplated), 163 (fails to specify mitigation measures and, instead, shifts the burden to the applicant to "determin[e] the best

**CIVIL NO. 24-1145 (JAG)** 15

FEMA's reliance on such measures to support its finding of no significant impact is improper as it relates to the Utilities PEA.

Accordingly, the Court finds that the record establishes that the projects can significantly affect the human environment and Defendants' contrary conclusion lies outside the legally permissible bounds laid by NEPA. Thus, Defendants must prepare an EIS.[6]

### B. Public Facilities PEA

It is also uncontested that the projects included in Public Facilities PEA constitute a "major Federal action" under NEPA. The projects similarly raise substantial questions as to whether they may significantly affect the quality of the human environment. Thus, any funding decisions as to how to restore public facilities, which provide critical services to the people of Puerto Rico, could significantly affect the human environment. *See* Docket No. 46-6 at 221 ("More resilient and upgraded public facilities will allow services to remain open during future disaster events, which will enable quicker emergency response times, increase public safety, reduce injury and death, and increase survivability."), 224-225, 282 ("An interruption of public service or utilities can adversely impact public health.").

However, Plaintiffs challenge to FEMA's decision not to prepare an EIS for the Public Facilities PEA is premised on the argument that FEMA did not adequately consider reasonable renewable energy alternatives to rebuilding the energy infrastructure in the island. The Public

---

method of minimizing impacts to local populations."), 171 (fails to specify mitigation measures and, instead, shifts the burden to the applicant to "coordinat[e] with service providers and construction managers to minimize impacts to public services and the communities they support.").

[6] Because the Court finds that FEMA must prepare an EIS in relation to the Utilities PEA, it need not address whether FEMA should have undertaken additional NEPA review in light of significant new information undermining the agency's decision to proceed with rebuilding Puerto Rico's frail electricity grid.

Facilities PEA does consider a renewable energy alternative: the use of microgrids. Docket No. 46-6 at 227, 230, 293, 309. But more importantly, the purpose of the Public Facilities PEA does not encompass restoring or replacing the energy infrastructure in the island,[7] and Plaintiffs do not identify language in the Public Facilities PEA that limits the reestablishment of power in governmental facilities to fossil fuel powered electricity. Moreover, upon review of the Public Facilities PEA, the Court finds that it adequately identifies potential environmental impacts and provides adequately specific information about mitigation measures to counteract such impacts.[8]

Accordingly, the Court finds Plaintiffs have not established by a preponderance of the evidence that FEMA violated NEPA by failing to prepare an EIS in relation to the Public Facilities PEA.[9]

---

[7] "The purpose of the programmatic actions considered herein is to restore Puerto Rican public facilities and their functions to meet the post-disaster needs of subrecipients and increase the resiliency of them in response to future disaster events." Docket No. 46-6 at 221. Public facilities covered by this PEA include emergency response facilities, non-profit houses of worship and churches, publicly owned and non-profit higher education facilities, state and municipal government offices, public housing communities, judiciary buildings, correction facilities, public recreation facilities, libraries, archives, museums, and certain PRIDCO facilities. Docket No. 46-4 at 221-22. It does not cover public utilities like the electrical infrastructure. While the PEA includes a section on public utilities, that section is about the impacts of the public facilities projects on utilities like electricity, not about how to restore, replace, or repair the energy infrastructure.

[8] In the section arguing that FEMA failed to take a hard look at the environmental consequences of the alternatives, Plaintiffs only reference a few pages from the Public Facilities PEA. The Court finds that FEMA's assessments in the Public Facilities PEA regarding impacts to air quality and endangered species are more robust than those in the Utilities PEA and include a more thorough discussion of specific mitigation measures to address these adverse impacts.

[9] Plaintiffs also argue that FEMA violated NEPA by failing to prepare a comprehensive EIS encompassing the projects in both the Utilities PEA and the Public Facilities PEA. However, because the Court found that the Public Facilities PEA was adequate and the preparation of an EIS was not mandated by NEPA, the Court need not address this argument. In any case, the Utilities PEA and the Public Facilities PEA do not constitute an overall project to reestablish power to the island since the Public Facilities PEA does not encompass restoring or replacing the energy infrastructure in the island. Similarly, Plaintiffs' claim that FEMA should have undertaken additional NEPA review in light of significant new information undermining the agency's decision to proceed with rebuilding Puerto Rico's frail electricity grid is also denied because the Public Facilities PEA does not encompass restoring or replacing the energy infrastructure in the island.

## CONCLUSION

For the following reasons, Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The case is hereby remanded for FEMA to prepare an EIS in relation to the Utilities PEA. Judgment shall be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this Tuesday, September 30, 2025.

s/ Jay A. Garcia-Gregory
JAY A. GARCIA-GREGORY
United States District Judge
